IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) |
| SAMUEL EUGENE HOLLOMAN, | )  1:15CR246-1 |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION AND ORDER

BEATY, District Judge.

This matter is before the Court on a Motion to Suppress [Doc. #9] filed by Defendant Samuel Eugene Holloman ("Defendant"). Defendant Holloman was indicted on June 30, 2015 on four counts, namely, possession with intent to distribute heroin, distributing cocaine hydrochloride, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm by a felon. [Doc. #1]. Defendant moved to suppress the evidence against him. [Doc. #9]. The Government filed a response opposing the motion [Doc. #12].

The Court held a hearing on the Motion to Suppress on September 11, 2015. At the conclusion of the hearing, the Court informed the parties that an Order would be forthcoming concerning its decision as to Defendant's Motion to Suppress. For the reasons discussed herein, the Court will deny Defendant's Motion to Suppress.

I.  BACKGROUND

Defendant argues that the initial warrantless search of 414 Herndon Drive, Winston-

Salem, North Carolina [hereinafter 414 Herndon Drive] was not justified by exigent circumstances and therefore was in violation of the Fourth Amendment. Defendant also argues that the subsequently issued warrant was based, in part, upon illegally acquired information included in the warrant application and therefore was issued in violation of the Fourth Amendment. The Government argues that the initial warrantless search of 414 Herndon Drive was justified by exigent circumstances and therefore complied with the Fourth Amendment. The Government also argues that the warrant was validly issued. In the alternative, the Government argues that even if the initial warrantless search of 414 Herndon Drive was not justified by exigent circumstances, any improperly seized evidence is still admissible under the inevitable discovery doctrine.

Officer D.A. Shuskey, an officer with the Winston-Salem Police Department for almost seven years, testified at the suppression hearing. According to Officer Shuskey, in August of 2014, an anonymous source informed him that a very strong odor of marijuana was coming from 414 Herndon Drive a few days per month and that during that time numerous people were coming and going from that residence. Officer Shuskey told the anonymous source to call him when he or she smelled the odor again. On August 21, 2014, the anonymous source called Officer Shuskey and told him that a strong marijuana odor was again coming from 414 Herndon Drive.

Four Winston-Salem Police Department officers, including Officer Shuskey, immediately responded to 414 Herndon Drive. The officers did not have a search warrant. The officers arrived at about 11:25 p.m. and parked their cars at the opposite end of the townhome building.

After exiting their cars, the officers smelled a strong odor of unburnt marijuana. The odor became stronger as officers approached 414 Herndon Drive, suggesting that it was in fact coming from that location. As Officer Shuskey passed an air vent coming from 414 Herndon Drive, the odor became even stronger.

The officers decided to attempt a "knock and talk" whereby an officer would knock on the front door of the residence in an attempt to speak with someone inside and gain consent to conduct a warrantless search. Officer Shuskey approached the front door while Officer Thomas stood ten to twelve feet away, Sergeant Fleming stayed in front of the residence (but out of sight), and Officer Burbank went to a common area in the back of the residence. Officer Shuskey explained that only one officer approached 414 Herndon Drive because anytime he attempts to gain consent to search a residence he does not want to overwhelm the residents with police presence.

According to Officer Shuskey, the doorbell appeared to be broken and the storm door was locked. Officer Shuskey knocked on the locked storm door and then on the door frame. After about twenty or thirty seconds, Officer Shuskey heard Defendant say, "Who is it?" from behind the door. Officer Shuskey responded, "It's the Police." He heard what sounded like Defendant opening two door locks before opening the solid front door. When Defendant opened the door, the smell of marijuana became even stronger, confirming to Officer Shuskey that marijuana was inside the residence. From where he was standing, Officer Shuskey could only see a few feet inside the residence.

With Defendant standing in the threshold of the door, Officer Shuskey asked Defendant

3

for permission to step inside to speak with him. Defendant refused to allow Officer Shuskey inside, said that they could speak outside, and continued to stand in the doorway. Officer Shuskey explained that he wanted permission to enter due to the overwhelming smell of marijuana coming from inside. Officer Shuskey asked for permission to search the residence, but Defendant refused to consent to a search. Given Defendant's refusal, Officer Shuskey explained that his only other option would be to seek a search warrant. Defendant then yelled something into the residence and slammed the main front door shut as he stepped outside, causing the door to lock. None of the officers, including Officer Shuskey, understood what Defendant had yelled. Officer Shuskey pushed Defendant over to Officer Thomas, who had stepped up, and Officer Shuskey kicked in the door of the residence in order to search inside based upon exigent circumstances. Officer Shuskey explained that the fact that Defendant had yelled into the residence suggested to him that there was at least one person inside and that Defendant could have been instructing that person to either harm police or destroy the contraband.

Officer Shuskey entered the residence and loudly announced "police." Officer Thomas joined Officer Shuskey inside the residence after Defendant was passed off to Sergeant Fleming. The officers found Brittany Branch in the living room and detained her. According to Defendant, she was "neither destroying evidence nor preparing to harm police" when she was found. [Doc. #9 at 4]. Officer Shuskey explained that he saw Sergeant Fleming struggling to control Defendant, so Officer Shuskey went back outside to assist him. Once Defendant was secured, Officer Shuskey went back inside to complete the search; according to Officer Shuskey,

4

at this point the residence "was not totally secured." The officers found nobody else, except Brittany Branch, inside the residence. However, during their initial warrantless search they saw in plain view a large amount of currency, a small amount of marijuana, and at least one firearm.

Officer Shuskey left to apply for a search warrant for the premises. Though Officer Shuskey omitted the items seen during the initial search from his application, he did include the presence of Brittany Branch and the fact that the smell of unburnt marijuana was even stronger once he was inside the residence. Officer Shuskey returned about an hour later with a search warrant and the officers executed it that evening. During the warrant-based search, officers found the following:

> 974.44 grams of heroin, contained in multiple clear plastic bags; 30 grams of cocaine, contained in a zippered pouch; 75.5 grams of MDMA, contained in a zippered pouch; 6 grams of marijuana; packaging equipment, including latex gloves, face masks, digital scales, wax paper, plastic bags and containers, cutting agents commonly mixed with narcotics, a hydraulic press, a Foodsaver vacuum sealer, and bags of rubber bands; bullets; firearms, including a Sig Sauer P2340, a .32 caliber Smith and Wesson Revolver, a .40 caliber Smith and Wesson Model SD40 pistol, an Olympic Arms Model P.C.F. 02 .233 (5.56) rifle, a Century Arms Cetme Sporter .308 caliber rifle, a .40 caliber Taurus Model PT140 Pro pistol, a Connecticut Valley Arms Shotgun (Modified); a total of $391,600.71 located throughout the house; a North Carolina Identification Card in the name of HOLLOMAN; and miscellaneous documents, some having the name of HOLLOMAN.

[Doc. #12 at 4-5].[1] Officer Shuskey testified that the marijuana was found on a table in the kitchen. He also explained that, during the warrant-based search, the officers found that the exhaust fan of a stove about six to eight feet from the marijuana was running on high. The vent

---

[1] Defendant stated that during this search police found "firearms; currency; large amounts of substances believed to be heroin, amphetamines and cocaine; and 6.3 [grams] of a substance believed to be marijuana." [Doc. #9 at 3].

5

for the exhaust fan was the same vent that Officer Shuskey had approached upon his initial arrival at the residence.

II. DISCUSSION

A. Legal Standard for Warrantless Searches Based Upon Exigent Circumstances

The Fourth and Fourteenth Amendments guarantee the rights of individuals to be free from unreasonable searches by the government. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." Kentucky v. King, 563 U.S. 452, 131 S. Ct. 1849, 1856, 179 L. Ed. 2d 865 (2011) (internal citation and quotation marks omitted).

However, the Supreme Court has recognized that "this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" Id. (internal citation and quotation marks omitted). Hence, "the warrant requirement is subject to certain reasonable exceptions." Id. "[A] police officer may search a home without a warrant if, in an emergency, 'the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" Hunsberger v. Wood, 570 F.3d 546, 553 (4th Cir. 2009) (quoting Mincey v. Arizona, 437 U.S. 385, 394, 98 S. Ct. 2408, 2414, 57 L. Ed. 2d 290 (1978)). The court looks at the "totality of the circumstances" to determine whether an exigency exists that justifies an officer acting without a warrant. Missouri v. McNeely, __ U.S. __, 133 S. Ct. 1552, 1559, 185 L. Ed. 2d 696 (2013). However, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." King, 131 S. Ct. at 1860 (quoting Graham v.

6

Connor, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (1989)). "The Government bears the burden of demonstrating exigent circumstances." United States v. Willis, 443 Fed. App'x 806, 807 (4th Cir. 2011) (citing Welsh v. Wisconsin, 466 U.S. 740, 749-50, 104 S. Ct. 2091, 2097, 80 L. Ed. 2d 732 (1984)).

The Fourth Circuit has "articulated a nonexhaustive list of factors to consider in determining whether exigent circumstances are present":

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband.

United States v. Moses, 540 F.3d 263, 270 (4th Cir. 2008) (quoting United States v. Turner, 650 F.2d 526, 528 (4th Cir. 1981)). Furthermore, the Fourth Circuit has explained that exigent circumstances exist "where police officers (1) have probable cause to believe that evidence of illegal activity is present and (2) reasonably believe that evidence may be destroyed or removed before they could obtain a warrant." Moses, 540 F.3d at 270 (quoting United States v. Cephas, 254 F.3d 488, 494-95 (4th Cir. 2001).

In King, the Supreme Court addressed the "police-created exigency" doctrine and its impact upon the exigent circumstances analysis. The Supreme Court explained that "[w]here . . . the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed." King, 131 S. Ct. at 1858. In that case, the Supreme Court specifically rejected a number of other factors that might be thought to apply to the police-

7

created exigency exception, including: (1) bad faith intent to avoid the warrant requirement, (2) reasonable foreseeability that an exigency would be created, (3) that the police already had probable cause and time to secure a warrant before approaching someone, and (4) that police conducted their investigation in a manner "contrary to standard or good law enforcement practices." Id. at 1860-61 (internal citation omitted).

B. Existence of Probable Cause

First, the Court must determine if the officers had probable cause to believe that contraband or evidence of a crime was present in 414 Herndon Drive. The Fourth Circuit has held that the smell of marijuana alone can provide probable cause to believe that contraband is present. United States v. Scheetz, 293 F.3d 175, 184 (4th Cir. 2002); United States v. Cephas, 254 F.3d 488, 495 (4th Cir. 2001) ("'[A] strong smell of marijuana coming from the apartment' . . . would almost certainly have given [the officer] probable cause to believe that contraband—marijuana—was present in the apartment.").[2]

Here, the officers smelled an odor coming from 414 Herndon Drive that they believed, based upon their training and their experience, to be marijuana. The smell became stronger as they approached the residence and even stronger once Defendant opened the door to the

---

[2] Though some states have legalized marijuana possession for some limited purposes, most marijuana possession is illegal under North Carolina law. N.C. Gen. Stat. §§ 90-94, -95. North Carolina has only legalized the possession of hemp extract for the treatment of intractable epilepsy in very specific circumstances which are inapplicable here. N.C. Gen. Stat. § 90-94.1. Furthermore, possession of marijuana is a federal crime. 21 U.S.C. §§ 812, 844. The Court notes this because if marijuana possession was not a crime, then smelling marijuana, by itself, would not necessarily support a finding a probable cause. See White v. Stanley, 745 F.3d 237, 241 (7th Cir. 2014). It is the fact that possessing marijuana is a crime that gives rise to probable cause.

8

residence.³ The officers therefore had a reasonable belief that marijuana was being possessed inside 414 Herndon Drive in violation of state and federal law. Therefore, the officers had probable cause to believe that contraband or evidence of a crime was present inside 414 Herndon Drive.

C. Reasonable Belief That Evidence May Be Destroyed Before Obtaining a Warrant

However, officers having probable cause to believe that contraband is present in a residence, by itself, does not give them the right under the Fourth Amendment to search that residence. Were this not the case, the warrant requirement of the Fourth Amendment would be a nullity. Instead, officers must have a legal justification for proceeding without a warrant. Moses, 540 F.3d at 269-70.

This case is similar to Moses, Cephas, and Turner, all three of which involved the possibility of an individual being informed of police presence and that individual potentially destroying controlled substances before they could be discovered by police. In all three cases, the Fourth Circuit determined that the defendants' suppression motions should have been denied.

In Moses, police were seeking to apprehend Moses, who was believed to be an "enforcer" for a street gang suspected of drug trafficking and several shootings. Officers observed Moses and a female come out of unit A of 407 North Cedar Street, place shoe boxes

---

³At the hearing, Defendant questioned whether such a small amount of marijuana could create the overwhelming odor the officers purported to smell. However, Officer Shuskey was not cross-examined about this issue and Defendant produced no evidence contradicting Officer Shuskey's statements.

in the back of a vehicle, then return to 407 North Cedar Street. However, the officers could not tell if they entered unit A or unit B of 407 North Cedar Street. Shortly thereafter, Moses and the female returned to the vehicle and drove away. Knowing that Moses was driving with a suspended license, officers stopped Moses about one block from 407 North Cedar Street. As Sergeant Kroh approached the car, he saw Moses outside the car doing something with his phone. When asked who he was communicating with, Moses replied that he was talking with his cousin, who lived in unit B of 407 North Cedar Street. Sergeant Kroh informed Officer Goodykoontz, who had remained at 407 North Cedar Street, that Moses may have warned someone back at 407 North Cedar Street about his being stopped by the police. Moses, 540 F.3d at 265-66.

Officer Goodykoontz knocked on the door of unit A—the same unit Moses and the female had emerged from—but nobody answered the door. Officer Goodykoontz could not see inside the unit. Sergeant Kroh and another officer went to unit B, which was attached to unit A, and the door was answered by Catressa Moore. Moore admitted to being Moses's cousin, but denied that Moses had just visited her, saying that he lived in unit A, and expressed her dislike for him. "Moore then began yelling and screaming at the officers, without provocation, creating such a loud commotion that Officer Goodykoontz heard it on the other side of the house while investigating unit A." Id. at 266. Moore consented to a search of unit B to determine whether it provided interior access to unit A and it was determined that it did not. Officer Goodykoontz asked Moses about his connection to unit A and he denied having any connection to it, saying that he had only been visiting his cousin in unit B. Officer

10

in the back of a vehicle, then return to 407 North Cedar Street. However, the officers could not tell if they entered unit A or unit B of 407 North Cedar Street. Shortly thereafter, Moses and the female returned to the vehicle and drove away. Knowing that Moses was driving with a suspended license, officers stopped Moses about one block from 407 North Cedar Street. As Sergeant Kroh approached the car, he saw Moses outside the car doing something with his phone. When asked who he was communicating with, Moses replied that he was talking with his cousin, who lived in unit B of 407 North Cedar Street. Sergeant Kroh informed Officer Goodykoontz, who had remained at 407 North Cedar Street, that Moses may have warned someone back at 407 North Cedar Street about his being stopped by the police. Moses, 540 F.3d at 265-66.

Officer Goodykoontz knocked on the door of unit A—the same unit Moses and the female had emerged from—but nobody answered the door. Officer Goodykoontz could not see inside the unit. Sergeant Kroh and another officer went to unit B, which was attached to unit A, and the door was answered by Catressa Moore. Moore admitted to being Moses's cousin, but denied that Moses had just visited her, saying that he lived in unit A, and expressed her dislike for him. "Moore then began yelling and screaming at the officers, without provocation, creating such a loud commotion that Officer Goodykoontz heard it on the other side of the house while investigating unit A." Id. at 266. Moore consented to a search of unit B to determine whether it provided interior access to unit A and it was determined that it did not. Officer Goodykoontz asked Moses about his connection to unit A and he denied having any connection to it, saying that he had only been visiting his cousin in unit B. Officer

10

in the back of a vehicle, then return to 407 North Cedar Street. However, the officers could not tell if they entered unit A or unit B of 407 North Cedar Street. Shortly thereafter, Moses and the female returned to the vehicle and drove away. Knowing that Moses was driving with a suspended license, officers stopped Moses about one block from 407 North Cedar Street. As Sergeant Kroh approached the car, he saw Moses outside the car doing something with his phone. When asked who he was communicating with, Moses replied that he was talking with his cousin, who lived in unit B of 407 North Cedar Street. Sergeant Kroh informed Officer Goodykoontz, who had remained at 407 North Cedar Street, that Moses may have warned someone back at 407 North Cedar Street about his being stopped by the police. Moses, 540 F.3d at 265-66.

Officer Goodykoontz knocked on the door of unit A—the same unit Moses and the female had emerged from—but nobody answered the door. Officer Goodykoontz could not see inside the unit. Sergeant Kroh and another officer went to unit B, which was attached to unit A, and the door was answered by Catressa Moore. Moore admitted to being Moses's cousin, but denied that Moses had just visited her, saying that he lived in unit A, and expressed her dislike for him. "Moore then began yelling and screaming at the officers, without provocation, creating such a loud commotion that Officer Goodykoontz heard it on the other side of the house while investigating unit A." Id. at 266. Moore consented to a search of unit B to determine whether it provided interior access to unit A and it was determined that it did not. Officer Goodykoontz asked Moses about his connection to unit A and he denied having any connection to it, saying that he had only been visiting his cousin in unit B. Officer

Goodykoontz and Sergeant Kroh took Moses's keys and attempted to determine whether they would access unit A. A key fit in the lock for unit A. At this point, the officers believed they had enough facts to support a warrant application but were concerned that someone inside unit A might be destroying evidence or presenting a threat to police while they waited outside. Based upon all of the information they had, namely, "Moses' behavior in making the phone call during the traffic stop, his cousin's behavior in creating a loud commotion, the presence of a gold-colored vehicle parked in front of the house [suggesting the presence of another person], the officers' inability to see inside unit A, and Moses' false denial of association with that unit," the officers decided to enter unit A to secure the premises. Id. at 267. The officers found nobody inside, but they did observe in plain view crack cocaine residue, a marijuana cigarette butt, and photos of Moses. Id. at 267.

The court held that the district court's determination that the warrantless search of unit A was justified by exigent circumstances was not clearly erroneous. Id. at 271. The court explained that while "officers initially had no evidence suggesting that another person was present in 407-A North Cedar Street," the information that officers had "suggest[ed] the possibility that someone else might be present." Id. at 271. In particular, the court noted that the cousin's "loud and unprovoked commotion added to the officers' suspicions that someone else was present inside unit A and that her outburst was calculated as a warning to that person." Id. at 271.

In Cephas, an informant told a patrolling officer that he had just come from an apartment where a 14-year-old girl was smoking marijuana with a man named Cephas. The

11

officer went to the apartment and knocked on the door. A man later identified as Cephas opened the door. The officer saw a young girl in the apartment and smelled a strong marijuana odor coming from the apartment. The officer asked if he could come inside to speak with Cephas, but Cephas tried to slam the door shut. The officer then forced his way into the apartment, told the eight or nine people inside to stay where they were, and secured the apartment until backup arrived. During a protective sweep by the officer or after a search warrant arrived, the officers observed controlled substances and firearms. Cephas, 254 F.3d at 490-91. The Fourth Circuit held that the officer's warrantless search was justified by exigent circumstances. Id. at 495-96.

In Turner, police believed Turner and Jones were selling cocaine from Turner's apartment. On the evening in question, an informant told police that he had just purchased cocaine from Turner and observed Kelly in Turner's apartment either snorting cocaine or bagging a large amount of cocaine into smaller sacks. Turner had told the informant that he and Kelly would soon move the cocaine to another location. The police immediately began preparing a warrant application to search Turner's apartment. However, before police could complete their application, Turner left the apartment and was arrested by police at a nearby store that could be seen from the apartment. No cocaine was found with Turner at the time of his arrest. Turner informed the police that Kelly was still in the apartment. Concerned that Kelly would destroy the cocaine in the two to three hours it would take to acquire a search warrant, the police entered the apartment, arrested Kelly, and secured the apartment until a search warrant could be acquired. Turner, 650 F.2d at 527. The Fourth Circuit held that the search

12

was justified by exigent circumstances. Id. at 528-29.

Beyond this case's similarity to the three cases just described, consideration of the "nonexhaustive" Moses factors[4] also supports a finding of exigent circumstances. Regarding the first and fifth factors, Officer Shuskey testified that he knew that controlled substances can be easily and quickly destroyed by being flushed down the toilet—far more quickly than an officer could acquire a warrant in his situation. Regarding the second and fourth factors, given that Officer Shuskey witnessed what he reasonably believed to be a signal from Defendant to another person, he also reasonably believed that the possessors of the contraband were aware of the police's imminent arrival and therefore were likely to soon destroy the contraband if the police did not quickly intervene. Given this case's similarity to Moses, Cephas, and Turner and the application of the Moses factors above, the officers had a reasonable belief that exigent circumstances existed when they engaged in their warrantless search of 414 Herndon Drive.

That Defendant's words were unclear is largely irrelevant; it's the fact that a person in a position to destroy the contraband or evidence of a crime has been informed of impending police presence, as articulated in the fourth Moses factor, that is of primary importance for purposes of the exigency analysis. Indeed, in Turner, no signal at all was sent by Turner to Kelly, the would-be destroyer of evidence. See Turner, 650 F.2d at 527-28. Instead, it was the fact of Turner's arrest that could have informed Kelly that the police were coming soon and that

---

[4] "(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband." Moses, 540 F.3d at 270.

the cocaine needed to be destroyed quickly to avoid detection. Id. This fact was enough for police to properly execute an exigency-based warrantless search in that case.

Similarly here, even though the officers did not know what Defendant said, Defendant's words coupled with the door slamming could reasonably be interpreted as a signal to others inside to take action. As explained in King, "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." King, 131 S. Ct. at 1860 (internal citation and quotation marks omitted). Once Defendant slammed the door, Officer Shuskey had to make a quick decision with the information available to him. Though Officer Shuskey didn't know the words Defendant had said, the reasonableness of his decision doesn't turn on what those words were; he only needed to know that a signal had been given. This fact, coupled with the other information Officer Shuskey had, justified his decision to enter the apartment to conduct a search for other individuals who may have destroyed the contraband.

Citing cases from the Seventh and Tenth Circuits, Defendant argued that a marijuana odor alone does not give rise to exigent circumstances justifying a warrantless search. In those cases, the Courts of Appeals held that because marijuana possession is not a serious offense, exigent circumstances sufficient to justify a warrantless search did not exist. White v. Stanley, 745 F.3d 237, 240-41 (7th Cir. 2014); United States v. Mongold, 528 F. App'x 944, 949-50 (10th Cir. 2013). However, Defendant conceded at the hearing that this may not be the law as interpreted by the Fourth Circuit and, indeed, it is not. In United States v. Grissett, 925 F.2d 776 (4th Cir. 1991) (per curiam), the Fourth Circuit held that probable cause based upon the

14

smell of marijuana emanating from a hotel room coupled with the objectively reasonable belief that the evidence would be destroyed before officers could obtain a warrant gave rise to exigent circumstances justifying a warrantless search. Id. at 778. The Fourth Circuit reaffirmed the principles of Grissett in Cephas, 254 F.3d at 495-96, and has not articulated an additional "serious crime" criterion in subsequent cases. Consequently, Defendant's argument that exigent circumstances did not exist because marijuana possession is not a serious crime must fail.

Regarding the possibility of the officers having created an improper exigency, the officers did not engage in, or threaten to engage in, any activity prohibited by the Fourth Amendment before conducting the search. To the contrary, Officer Shuskey expressly said he intended to comply with the Fourth Amendment by getting a warrant if Defendant did not consent to a search. The officer's approach of the house, knock on the door, and attempt to speak with Defendant also included no illegality. See Florida v. Jardines, __ U.S. __, 133 S. Ct. 1409, 1415-16, 185 L. Ed. 2d 495 (2013); Cephas, 254 F.3d at 492-94.

Defendant also argued that the police should have proceeded to get a search warrant once Defendant refused to allow police to enter. [Doc. #9 at 3]. However, the Supreme Court made clear in King that police do not have to seek a warrant once they have the bare minimum required to meet probable cause. King, 131 S. Ct. at 1860-61. Among other reasons for not immediately seeking a search warrant, police "may think that a short and simple conversation may obviate the need to apply for and execute a warrant." Id. at 1860. Here, Officer Shuskey's conduct falls squarely within the ambit of the "short and simple conversation" described in King. Therefore, there was no improper police-created exigency in this case that would merit

15

suppression of the evidence.

In conclusion, the officers had probable cause to believe that contraband or evidence of a crime was present in 414 Herndon Drive. Additionally, the officers had an objectively reasonable belief that exigent circumstances existed justifying a warrantless search. Therefore, the officers' warrantless search of 414 Herndon Drive complied with the Fourth Amendment.

D. Validity of the Warrant

Finally, the Court addresses the validity of the search warrant which led to the discovery of the evidence in this case. A search warrant issued by a magistrate must be supported by probable cause. U.S. Const. amend IV. Whether the facts alleged in a warrant application give rise to probable cause is based upon a "'totality-of-the-circumstances' analysis rooted in common sense." United States v. Montieth, 662 F.3d 660, 664 (4th Cir. 2011) (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983)). A reviewing court does not conduct a *de novo* analysis; instead, the reviewing court only looks to see if the magistrate's finding of probable cause had a substantial basis. Massachusetts v. Upton, 466 U.S. 727, 728, 104 S. Ct. 2085, 2085, 80 L. Ed. 2d 721 (1984) (per curiam).

Here, the warrant application amply supported the magistrate's finding of probable cause. The warrant application explained Officer Shuskey's training and experience, his history with the anonymous informant, the fact that officers corroborated the tip regarding the presence of the marijuana odor, and the events which led to the exigency-based warrantless search. Because, as the Court determined above, the initial warrantless search complied with the Fourth Amendment, Officer Shuskey was permitted to include his plain view observations during that

16

search in his application. However, Officer Shuskey omitted from his search warrant application most of his observations from his warrantless search except for the facts that the marijuana odor was even stronger inside 414 Herndon Drive and that Brittany Branch was present. Yet, neither of these facts was necessary to support the magistrate's finding of probable cause. As explained above in Section II.B, the smell of marijuana, by itself, is sufficient to support probable cause to believe that contraband or evidence of a crime is present. Though Officer Shuskey also omitted the fact that the informant had also reported numerous cars coming and going from the residence, this omission does not defeat the magistrate's finding of probable cause because the other information in the application clearly supported the magistrate's finding.

The Court concludes that there was a substantial basis for the magistrate's finding of probable cause and that the search warrant was validly issued. Therefore, the search conducted pursuant to the warrant complied with the Fourth Amendment and the evidence seized during that search is admissible.

III. CONCLUSION

In sum, the Court finds that the officers had probable cause to believe that evidence of a crime or contraband was present inside 414 Herndon Drive. The officers also reasonably believed that exigent circumstances existed justifying a warrantless search. The magistrate's finding of probable cause was supported by a substantial basis and the search warrant was therefore validly issued. Therefore, the Court concludes that, in this instance, both the initial warrantless search and the subsequent search executed pursuant to a validly issued search

warrant complied with the Fourth Amendment and the evidence seized is admissible.[5]

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress [Doc. #9] is DENIED.

This the 6th day of October, 2015.

_____
United States District Judge

---

[5] Given the Court's findings with respect to the legality of the warrantless search and the validity of the warrant, the Court need not address the Government's argument that the evidence should be admitted under the inevitable discovery doctrine.